**Hearing Date: April 28, 2022 at 10:00 a.m.**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

In re:

141 TROUTMAN LLC, *et al.*,[1]

Debtors.

Chapter 11

Case No. 1-22-40337-nhl

(Jointly Administered)

### MEMORANDUM OF LAW IN SUPPORT OF MOTION (I) FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d), (II) TO PERMIT RECEIVER TO COLLECT RENTS PURSUANT TO 11 U.S.C. § 543(d), AND/OR (III) TO DISMISS CASES PURSUANT TO 11 U.S.C. §§ 105 AND 1112

Wells Fargo Bank, National Association, as Trustee for the Registered Holders of CSAIL 2019-C15 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2019-C15 ("Lender"), by and through its attorneys, McCarter & English, LLP, respectfully submits this memorandum of law in support of its motion (the "Motion") for the entry of an order (i) granting relief from the automatic stay pursuant to Section 362 of Title 11 of the United States Code (the "Bankruptcy Code") and waiving any stay imposed under Fed. R. Bank. P. 4001(a)(3), (ii) excusing the state court rent receiver (the "Receiver") from compliance with Section 543 of the Bankruptcy Code and authorizing the Receiver to collect rents and manage the subject property pursuant to Section 543(d) of the Bankruptcy Code, and/or (iii) dismissing the chapter 11 cases of Debtors 141 Troutman LLC, 243 Suydam LLC and Union Residence LLC (collectively, "Debtors") pursuant to Sections 105 and 1112 of the Bankruptcy Code, together with such other and further relief as this Court deems just and proper. In support of the Motion, Lender respectfully states as follows:

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal identification number are: 141 Troutman LLC (6403), 243 Suydam LLC (7683) and Union Residence LLC (1682).

## PRELIMINARY STATEMENT

1.     Lender is the holder of a mortgage loan issued to Debtors in the original principal amount of $14,000,000, the terms of which Debtors have been in default of since August 2020, and under which Debtors owe Lender in excess of $16,630,000 as of the date of their bankruptcy filings.  Debtors have failed to make full and timely monthly payments under the subject loan documents since August 2020.  In essence, Debtors have been paying Lender whatever amounts they wish to pay, whenever they wish to pay them.  Debtors' failures have not been limited to their contractual obligations, as they also spent three months prior to their bankruptcy filings blatantly violating the clear terms of a state court order appointing a rent receiver for the real properties that serve as security for Lender's loan.  In fact, even after Debtors' motion in state court to vacate the Receiver's appointment was summarily denied, their refusal to comply with the state court's order continued until their bankruptcy filings.  Debtors' own filings thus far in their bankruptcy cases reveal that they were conducting business as usual in the preceding months, despite the existence of the state court's order prohibiting them from doing so.

2.     Debtors' obligations to Lender are substantial.  Accepting as true Debtors' own valuations of the subject mortgaged properties, Lender is not only the lone secured creditor in these cases, but also the single largest unsecured creditor by a wide margin.  As a result, and because Lender will vote against any plan of reorganization proposed by Debtors in these cases, Debtors have no realistic possibility of reorganization.  Under the circumstances, relief from the automatic stay is appropriate to permit Lender to proceed with its pending foreclosure action against the subject properties.

3.     After months of shirking contractual obligations and violating court orders, and just before the court-appointed Receiver could collect March rent payments from tenants of the subject

properties, Debtors filed the instant bankruptcy proceedings.  Debtors' lack of any activity in the bankruptcy cases, together with their conduct dating back to at least July 2021, as summarized above and detailed more specifically hereafter, clearly demonstrates that these bankruptcy cases were filed in bad faith, such that stay relief should be granted in favor of Lender, or, in the alternative, Debtors' bankruptcy cases should be dismissed.  This case is nothing more than a two-party dispute between Debtors, each a single asset real estate entity, and Lender, the secured creditor holding the mortgage on the subject properties and the only party entitled to possession and use of the rents generated by the subject property.

4.       Should the Court decline to immediately grant stay relief or dismiss these cases, Lender respectfully requests that the Receiver appointed by the state court be excused from compliance with Section 543 of the Bankruptcy Code and authorized to collect the rents generated by the subject properties.  Debtors' prepetition misconduct confirms they cannot be trusted with money or with operation of the subject properties, and the Receiver should remain in place to protect Lender's interests.

## JURISDICTION AND VENUE

5.       This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §1334.  This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2)(A) and (O).  Venue is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

6.       The statutory predicates for the relief requested in this Motion are Sections 105, 343, 362 and 1112 of the Bankruptcy Code and Rules 1017, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

ME1 39867231v.1

## FACTUAL BACKGROUND

**The Loan Documents**

7.      Lender is the holder of a loan to Debtors in the original principal amount of $14,000,000 (the "Loan"), which Loan is evidenced by the following documents, among others (collectively, the "Loan Documents"):

a)      An Amended, Restated and Consolidated Promissory Note (the "Note") executed by Debtors on December 14, 2018 in favor of BSPRT CMBS Finance, LLC ("Original Lender") (see Declaration of Melissa Nodarse in Support of the Motion (the "Nodarse Decl."), Ex. A);

b)      A Loan Agreement (the "Loan Agreement"), dated December 14, 2018, executed by Original Lender and Debtors (Nodarse Decl., Ex. B);

c)      An Amended, Restated and Consolidated Mortgage and Security Agreement (the "Mortgage"), dated December 14, 2018, executed by Debtors and recorded with the Office of the City Register of the City of New York on December 24, 2018 as CRFN 2018000423041 (id., Ex. C);

d)      An Assignment of Rents and Leases (the "Assignment of Rents") dated as of December 14, 2018 and executed by the Debtors (id., Ex. D); and

e)      A Guaranty of Recourse Obligations (the "Guaranty"), dated December 14, 2018, executed by Joel Lefkowitz, Lipa Lefkowitz and Wolf Wercberger (collectively, "Guarantors"), members and owners of Debtors (id., Ex. E).

8.      The Mortgage encumbers four multi-family residential apartment buildings, with addresses of 555-557 Union Street, Brooklyn, New York 11215 (the "Union Property"), 141 Troutman Street, Brooklyn, New York 11206 (the "Troutman Property") and 243 Suydam Street,

Brooklyn, New York 11237 (the "Suydam Property") (collectively, the "Mortgaged Property").
Id. at ¶7.

9.       By way of a series of assignments described in detail in the Nodarse Decl., the Loan Documents were assigned to Lender.  See id. at ¶¶10-13, Exs. A, F-I.

10.      Lender is the present holder of the Loan, and is in physical possession of the original Note and Allonges.  See id. at ¶14.

**Relevant Loan Terms**

11.      Pursuant to the Loan Agreement, Debtors were required to make monthly interest-only payments to Lender at the per annum interest rate of 5.60% on the then-outstanding principal indebtedness, together with any other fees, charges and expenses due under the Loan Documents ("Debt Service Payments").  See id. at Ex. B, §2.6.  The failure to make timely Debt Service Payments is an Event of Default under the Loan Documents.  See id., Ex. B, §10.1(a).

12.      The Loan Documents also require Guarantors to maintain a sufficient level of liquidity such that they can use their own funds as necessary to fund Debtors' obligations under the Loan Documents and protect Lender's collateral, the Mortgaged Property.  Specifically, the Guaranty provides as follows:

> Covenants.  Until all of the Obligations and the Guaranteed Obligations have been paid in full, Guarantor shall (i) maintain . . . (B) Liquid Assets having a market value of at least $1,000,000.00 (in the aggregate, if Guarantor consists of more than one Person) . . . .

Id., Ex. E, §5.2.

13.      Pursuant to the Mortgage, "[u]pon reasonable notice to Borrower and subject to the rights of any Tenants under Leases occupying the Property, Lender and its agents shall have the right to enter and inspect the Property at all reasonable times."  Id., Ex. C, §8.8.

14.     Pursuant to Section 12.1(b) of the Loan Agreement and Section 1.1 of the Guaranty, Debtors' bankruptcy filings render the Loan fully recourse against Debtors and Guarantors.  <u>See id.</u>, Ex. B, §12.1(b) and Ex. E, §1.1.

**<u>Debtors' Defaults and Lack of Cooperation</u>**

15.     Debtors have been in default under the terms of the Loan Documents since at least August 2020, when they failed to make the full Debt Service Payment due that month.  Debtors have not made a full monthly Debt Service Payment in any month since August 2020, instead making only sporadic payments of *alleged* excess rental income after the payment of *alleged* operating expenses.  Debtors' payment defaults under the Loan Documents are not in dispute.  The amount of interest that has accrued on the Loan since August 2020 alone exceeds $2,600,000, and Lender has received from Debtors only approximately $450,000 during this time.  <u>Id.</u> at ¶19.

16.     Additionally, despite the requirement in the Guaranty that Guarantors maintain liquidity of at least $1,000,000 to fund Debtors' obligations under the Loan Documents, Guarantors did not use their own funds to bridge the monthly Debt Service Payments deficits.  <u>Id.</u> at ¶20.

17.     By letter dated January 8, 2021, the outstanding principal balance of the Note was accelerated and is presently due and owing to Lender in full, together with contract and default interest, prepayment charges, late charges, expenses, and attorneys' fees as set forth in the Loan Documents.  <u>See id.</u> at Ex. J.  As of the filing of this Motion, the total amount due under the Loan Documents is in excess of $16,630,000.  <u>Id.</u> at ¶¶21, 34.

18.     Notwithstanding Debtors' defaults under the Loan Documents and Lender's acceleration of the Loan, Lender attempted for more than one year to address the various defaults by (i) communicating with Debtors, (ii) requesting financial information from Debtors, and (iii)

6

having Debtors transmit monthly excess cash flows (which were always less than the contractual Debt Service Payments required by the Loan Documents), conditioned upon financial transparency from Debtors and without waiver of the resulting events of default under the Loan Documents. Specifically, Lender required Debtors to (a) provide certain monthly financial reports reflecting their income and expenses and (b) remit to Lender the net monthly revenue reflected in the financial reports.  Id. at ¶22.

19.     Initially, Debtors purported to comply with these requirements, submitting internally-prepared financials on a monthly basis and paying the alleged net revenues to Lender, although Lender was unable to verify the accuracy of such financial reporting.  Beginning in the Summer of 2021, however, Debtors ceased providing *any* financial reporting to Lender, and ceased making monthly payments of alleged excess rental revenues, despite repeated requests for same. Although Debtors made one belated payment to Lender (alleged excess rents for August, September and October were paid on November 9, 2021), the payment was not supported by *any* financial reporting.  The last monthly report provided by Debtors pre-petition was for July 2021. Id. at ¶23.

20.     Beginning in July 2021, at or around the same time Debtors stopped providing any financial reporting, Lender requested access to the Mortgaged Property in order to verify Debtors' prior financial reporting and conduct appraisals of the Mortgaged Property.  In a further attempt to hide information about their financial condition and the condition of the Mortgaged Property from Lender, Debtors effectively ignored and/or refused all such requests, even though the Loan Documents require Debtors to grant Lender access.  Lender was therefore prevented from inspecting the Mortgaged Property, as it had the right to do under the Loan Documents.  Id. at ¶24.

21.　　Certain discussions between Lender and the soon-to-be Debtors prior to the bankruptcy filings included some financial information, which, in Lender's opinion, was incomplete. Id. at ¶25.

22.　　On April 1, 2022, just prior to the scheduled April 5, 2022 status conference before the Court and the hearing on Lender's application for a Rule 2004 examination of Debtors, summary information was provided for pre-petition revenue and expenses and a proposed cash collateral budget.  On April 5, 2022 Debtors filed a motion for use of cash collateral, with the same budget reflecting an inability to make required payments to Lender, and have subsequently circulated a revised budget eliminating many line item expenses in order to create the picture of the ability to make post-petition payments.

**State Court Action**

23.　　On September 17, 2021, Lender commenced an action against Debtors in the Supreme Court of the State of New York, County of New York (the "State Court"), Index No. 523654/2021 (the "State Court Action"), pursuant to which Lender sought, among other relief, the appointment of a rent receiver for the Mortgaged Property.[2] Id. at ¶26.

24.　　By Order dated November 30, 2021 (the "Receivership Order"), the State Court appointed Arthur Greig, Esq., as Receiver for the Mortgaged Property.  See Nodarse Decl., Ex. K. Pursuant to the Receivership Order, Debtors and their members, partners, agents, servants, employees and property manager were ***enjoined and restrained from collecting rents*** of the Mortgaged Property, and were expressly directed to, among other things:

　　　　a)　　immediately turn over to the Receiver all security deposits held by them;

---

[2] On January 12, 2022, in anticipation of the expiration of New York's mortgage foreclosure moratorium, Lender amended its complaint in the State Court Action to include a count for foreclosure of the Mortgage.

b)      immediately turn over to the Receiver all rents of the Mortgaged Property and all other monies then on deposit in any of Debtors' operating accounts;

c)      deliver to the Receiver any and all papers and other things affecting the rental or other operation of the Mortgaged Property, including leases, rent schedules, reconciliations of security deposits and account information, financial statements, tax returns, property management reports, contracts with vendors and service personnel, list of suppliers, employee roster and payroll information, listing of tax identification numbers used by Debtors in connection with their deposits of rents, and all other items that the Receiver may reasonably require to manage, operate or lease the Mortgaged Property; and

d)      cooperate with the Receiver in all respects in order to enable the Receiver to pay expenses and collect rents, issues and profits of the Mortgaged Property.

25.     Initially, Debtors blatantly refused to comply with each and every aspect of the Receivership Order.  Specifically, they continued collecting rents in violation of the injunction, and they refused to turn over *any* documents, information or monies on deposit to the Receiver. Accordingly, on December 29, 2021, Lender filed a motion to hold Debtors and their principals in contempt for their refusal to comply with the Receivership Order (the "Contempt Motion").  A hearing on the contempt motion was originally scheduled for February 9, 2022.[3] Id. at ¶28.

26.     On December 28, 2021, in a transparent effort to buy themselves more time while continuing to violate the Receivership Order, Debtors filed a proposed Order to Show Cause, seeking a temporary stay of the Receivership Order and, ultimately, an Order vacating the Receivership Order.  Id. at ¶29.  In his Affidavit in support of Debtors' Order to Show Cause,

---

[3] Debtors requested an adjournment of the contempt motion on February 8, 2022, the eve of the return date, and were able to secure an adjournment to March 2, 2022 over Lender's objection.  Debtors then filed their bankruptcy petitions before the return date of the Contempt Motion.

Guarantor Joel Lefkowitz conceded that, as a result of losses relating to other businesses and investments, he and the other Guarantors no longer had the financial ability to bridge the Debtors' monthly Debt Service Payment deficits.  Id., Ex. L at ¶21.

27.     On January 19, 2022, the State Court summarily denied Debtors' request to vacate the Receivership Order, leaving intact Debtors' obligations to comply therewith.  See id., Ex. M.

28.     Nevertheless, Debtors and their principals still cavalierly refused to fully comply with the Receivership Order, providing only certain limited documents and information to the Receiver, while refusing to turn over security deposits, rents and other monies, and ignoring the Receiver's requests for additional information.  Id. at ¶31.

29.     On February 8, 2022, more than two months after entry of the Receivership Order and weeks after the State Court's denial of Debtors' Order to Show Cause, Lender filed an Affirmation of the Receiver in further support of the Contempt Motion, pursuant to which the Receiver explained that he had still received no transparency or cooperation from Debtors and their principals, despite the requirements of the Receivership Order.  See id., Ex. N.

**Debtors' Bankruptcy Filings**

30.     On February 24, 2022 (the "Petition Date"), days before the return date of the Contempt Motion, Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court (collectively, the "Petitions"), together with their bankruptcy schedules.  On the Petitions, each Debtor identifies itself as a "single asset real estate" entity as defined in 11 U.S.C. §101(51B).

31.     Debtors' schedules of assets and liabilities contain the following information relevant to this Motion:

a)      On their Schedules A/B (Part 1), Debtors indicate that they have funds in bank accounts at Signature Bank totaling $137,498 in the aggregate, despite the fact that the Receivership Order expressly required Debtors to immediately turn over all such funds to the Receiver and enjoined Debtors from ongoing rent collections.

b)      On Schedule A/B (Part 9), Debtors asserted the aggregate book value of the Mortgaged Property to be $13,563,903 (Union Property valued at $6,688,160, Troutman Property valued at $2,360,000 and Suydam Property valued at $4,515,743), significantly less than the total amounts due under the Loan Documents as of the Petition Date, which exceed $16,630,000.

c)      On Schedule E/F (Part 2), Debtors identify general unsecured claims totaling $677,226.50 in the aggregate[4], but do not take into consideration Lender's unsecured deficiency claim, which, based on Debtors' valuations of the Mortgaged Property, exceeds $3,000,000.

d)      On Schedule A/B, Part 2, each Debtor indicates that it is not holding any deposits or prepayments.

32.      On March 18, 2022, each Debtor filed its Statement of Financial Affairs (each a "SOFA", and together the "SOFAs").  The SOFAs contain the following relevant information:

a)      Debtors allegedly made transfers totaling $142,756.61 in the aggregate during the 90 days immediately preceding the Petition Date (November 26, 2021 – February 23, 2022), despite the fact that the Receivership Order (of which Debtors and

---

[4]Debtors have each alleged the existence of the following identical unsecured claims:  (1) Abrams Fensterman LLP, in the amount of $15,000; (2) Consolidated Edison, in the amount of $34,024.31; (3) Laz Power, in the amount of $6,900; (4) Rock Brokerage, in the amount of $80,000; and (5) Ye & Bro Realty NYC, in the amount of $400,000.  It would appear that these alleged claims are against all Debtors, jointly as co-obligors, as opposed to against each Debtor in identical amounts (although Debtors do not identify each other as co-debtors with respect to such claims). Additionally, the existence of alleged loans from Ye & Bro Realty NYC, Rock Brokerage and 12 Meserole St LLC may amount to additional defaults under the Loan Documents.

their principals were on notice for 79 of the 90 days) expressly directed Debtors and their principals to immediately turn over all Rents and other monies on deposit to the Receiver, and enjoined Debtors and their principals from collecting rents of the Mortgaged Property and from interfering in any manner with the Mortgaged Property or its possession by the Receiver.[5]

b)      Debtors are allegedly holding security deposits totaling $75,654.98 in the aggregate, despite the fact that the Receivership Order expressly directed Debtors to turn over all such deposits to the Receiver, and despite the representation on each Debtor's Schedule A/B (Part 2) that it was not holding any deposits or prepayments as of the Petition Date.

c)      On Part 3, Question No. 8 of the SOFAs, each Debtor indicates that none of its property was in the hands of a receiver within one year before the Petition Date, despite the State Court's appointment of the Receiver and denial of Debtors' motion to vacate the Receivership Order.

33.      Approximately five (5) weeks after the cases commenced, Debtors filed applications for retention of counsel and a motion to use cash collateral.

34.      Using Debtors' own valuations of the Mortgaged Property (total aggregate value of $13,563,903), and given the nondefault contract rate of interest under the Loan Documents (5.60%), Debtors must demonstrate the ability to make monthly payments to Lender in the amount of at least $63,298.21 in order to satisfy the requirements of 11 U.S.C. §362(d)(3), as explained in greater detail below.  Despite the passage of more than one month since the Petition Date, Debtors have yet to file anything with the Court that would suggest an ability to make such payments.  A

---

[5] The information provided by Debtors to Lender on April 1, 2022 again confirmed violations of the injunction in the State Court Receivership Order.

revised budget has circulated among counsel reflecting a possible ability to make such payments, but that budget fails to include expenses that Debtors paid prior to the bankruptcy filing such as broker fees and construction costs.

## Additional Valuation Information

35.    Lender has obtained information regarding the valuation of the Mortgaged Property, which suggests an aggregate "as-is" market value of $15,300,000, and an aggregate prospective value upon stabilization of $16,300,000.  See Nodarse Decl., Exs. O-Q.

36.    The appraisals provided to Lender indicate that Debtors and/or their property managers provided no information, such as rent rolls and income and expense statements, and that the interior of the Mortgaged Property could not be inspected due to a lack of access.  Accordingly, the appraiser was forced to make extraordinary assumptions about the layout and condition of the Mortgaged Property, as well as vacancy rates, and to consider the values of other multi-family properties believed to be similar to the Mortgaged Property.  See id., Exs. O-Q.

37.    The appraisals obtained by Lender remain in draft form, and the final value conclusions of any appraiser are presumably determined by actual revenue and expense information, which was unavailable here.  However, even using the valuation information provided to Lender, there still exists a significant deficiency between the value of the Mortgaged Property and Lender's claim as of the Petition Date.

## Lender's Claim

38.    Prior to the proof of claim bar date, Lender anticipates filing a proof of claim in the Debtors' bankruptcy cases in the approximate amount of **$16,632,730.20**, consisting of the following components:

a)    principal balance of **$14,000,000**;

b)      accrued interest of approximately $2,660,587.81[6], less unapplied payments in the amount of $454,000.03, for a net total of at least **$2,206,587.78**;

c)      protective advances for Special Servicer, taxes and insurance, totaling **$83,130.98**;

d)      interest on advances, totaling **$29,681.65**;

e)      additional attorneys' fees and costs, totaling in excess of **$92,000**;

f)      special Servicing fees incurred by Lender, totaling **$54,250**;

g)      late charges, totaling **$22,519.79**

h)      prepayment liability, totaling at least **$140,000**;

i)      February 2022 appraisal fees of **$3,000**;

j)      **$1,500** paid to Receiver to secure bond; and

k)      Insufficient funds fees, totaling **$60**.

See Nodarse Decl. at ¶34.

39.      Lender's proof of claim will be secured up to the value of its collateral, the Mortgaged Property, which value may fall anywhere between the book values alleged by Debtors ($13,563,903 in the aggregate) and the stabilized values reflected in the recent valuation information provided to Lender by an appraiser ($16,300,000 in the aggregate, upon stabilization), or some future valuation as determined by the Court.  Lender's claim will be unsecured with respect to any excess amounts above the value of the Mortgaged Property, such that Lender will be left with a general unsecured claim ranging anywhere between $332,730.20 and $3,068,827.20.

---

[6] The Loan Agreement provides for the compounding of interest upon the occurrence of an Event of Default, such that the per diem interest amount is subject to adjustment on a monthly basis.  See Nodarse Decl., Ex. B, §2.5(c).

ME1 39867231v.1

## **BURDEN OF PROOF**

40.     In the context of a motion for relief from the automatic stay under Section 362(d) of the Bankruptcy Code, such as the instant Motion, the party seeking such relief has the burden of proof on the issue of the debtor's equity in the subject property, while "the party opposing such relief has the burden of proof on ***all other issues***."  11 U.S.C. §362(g) (emphasis added).

41.     Here, Lender has satisfied its burden of establishing Debtors' lack of equity in the Mortgaged Property.  Specifically, Lender has established that as of the Petition Date, there was due and owing from Debtors at least $16,630,000 under the Loan Documents.  Debtors themselves value the Mortgaged Property at $13,563,903 in the aggregate, more than $3,000,000 less than Lender's claim.  Even using the higher valuations recently provided to Lender, it is clear that Debtors have no equity in the Mortgaged Property.

42.     Pursuant to Section 362(g), the burden of proof on all other issues raised by the Motion rests with Debtors.  For the reasons that follow, Debtors cannot satisfy their burden on any issue raised herein.

## **LEGAL ARGUMENT**

I.     **LENDER IS ENTITLED TO RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**

     a.  **Section 362(d)(1)**

43.     Section 362(d)(1) provides that the court shall grant relief from the automatic stay "for cause".  11 U.S.C. §362(d)(1).  "Cause" is not defined in the Bankruptcy Code, and "[t]he court should weigh the particular circumstances of each case to reach the solution that is most just to all parties."  In re Keene Corp., 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994).  Whether cause to lift the stay exists should be determined on a case-by-case basis.  See Sonnax Indus.Inc. v. Tri Component Prods. Corp., 907 F.2d 1280, 1286 (2d Cir. 1990).

ME1 39867231v.1

44.     In a recent case before this Court, <u>In re Kolnberger</u>, the Court found cause to lift the automatic stay and permit a secured creditor to proceed with its mortgage foreclosure action where, as here, state law issues predominated in the foreclosure action and there would be no prejudice to the debtor's other creditors due to the absence of equity in the subject real property. 603 B.R. 253, 268-69 (Bankr. E.D.N.Y. 2019).

45.     The same is true in the instant bankruptcy proceedings.  The State Court Action, which is an action to foreclose the Mortgage on the Mortgaged Property, involves exclusively state law issues.  Lender's continued prosecution of the State Law Action will not prejudice Debtors' other creditors, all of whom are unsecured, as there is no equity in the Mortgaged Property.

46.     Indeed, permitting Lender to continue prosecuting its foreclosure action up to the point of a final judgment will in no way prejudice Debtors, who would be free to proceed with their bankruptcy proceedings on a parallel track.  Lender's foreclosure count in the State Court Action was only filed in January 2022[7], and Debtors filed their Verified Answer on February 11, 2022.  As such, the State Court Action remains in a stage of relative infancy.

47.     Finally, as explained in greater detail below in subsection I(d), Debtors have no realistic possibility of confirming a plan of reorganization.  Thus, in declining to grant Lender relief from the automatic stay, the Court will merely be facilitating Debtors' actual goal of delaying and frustrating Lender's exercise of its rights under the Loan Documents.  Lender should not be compelled to sit back idly as Debtors flounder in this Court without any realistic prospect of reorganizing.

48.     In addition to the above, courts in the Second Circuit have found that filing a petition in bad faith constitutes cause to lift the automatic stay under Section 362(d)(1).  <u>In re</u>

---

[7] The State Court Action was originally commenced by Lender in September 2021, but without a mortgage foreclosure count.

Kornhauser, 184 B.R. 425, 428 (Bankr. S.D.N.Y. 1995) ("[I]t is well settled that a bad faith filing constitutes "cause" for relief from the automatic stay."); see also Matter of Little Creek Dev. Co., 779 F.2d 1068, 1072 at n.2 (5th Cir. 1986) (listing cases).  Lender posits that these bankruptcy cases were clearly filed in bad faith, as explained in greater detail in section II, below.

### b. **Section 362(d)(2)**

49.    Pursuant to Section 362(d)(2) of the Bankruptcy Code, a bankruptcy court must grant relief from the automatic stay where "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization."  11 U.S.C. §362(d)(2).

50.    Here, given the value of the Mortgaged Property and the amount of Lender's claim, it is clear that Debtors have no equity in the Mortgaged Property.  Accordingly, Lender's entitlement to relief from the automatic stay turns on whether the Mortgaged Property is necessary to an effective reorganization, a requirement that Debtors have the burden to establish.  See 11 U.S.C. §362(g).

51.    It is not sufficient that the Mortgaged Property be necessary for *any* reorganization, but it must instead be necessary for an *effective* reorganization.  Accordingly, there "must be a reasonable possibility of a successful reorganization within a reasonable time," and the Mortgaged Property must be necessary to that reorganization.  United Sav. Ass'n of Tex. V. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.), 484 U.S. 365, 375-76, (1988).  Under this test, relief from the stay should be granted if the debtor has no reasonable likelihood of reorganization.  The test requires "a showing by a debtor and a determination by the bankruptcy court that a proposed or contemplated plan is not patently unconfirmable and has no realistic chance of being confirmed."  In re 266 Washington Assocs., 141 B.R. 275, 281 (Bankr. E.D.N.Y. 1992).

52.     As explained in greater detail below in subsection I(d), Debtors have no realistic possibility of confirming a plan of reorganization.  Accordingly, the Court should grant Lender relief from the automatic stay under Section 362(d)(2) to permit Lender's continued prosecution of the State Court Action.

**c.  <u>Section 362(d)(3)</u>**

53.     Pursuant to Section 362(d)(3) of the Bankruptcy Code, after notice and a hearing, the court ***shall*** grant relief from the automatic stay:

> (3) with respect to a stay of an act against single asset real estate under subsection (a), [upon request by] by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later –

> (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

> (B) the debtor has commenced monthly payments that –

> (i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

> (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate.

11 U.S.C. §362(d)(3).

54.     Here, Debtors acknowledged in their Petitions that each is a single asset real estate debtor within the meaning of 11 U.S.C. §101(51B), such that the Court need not make this determination.  Accordingly, Debtors have the burden of establishing that, within 90 days of the

Petition Date (on or before May 25, 2022), they can satisfy one of the two requirements of Section 362(d)(3).

55.     First, as explained in greater detail below in subsection (I)(d), Debtors cannot file a plan of reorganization on or before May 25, 2022 that has a reasonable possibility of being confirmed within a reasonable time, because Lender will vote against any such plan and Debtors will not be able to procure the support of an impaired creditor class.  Thus, Debtors cannot satisfy the requirement of Section 362(d)(3)(A).

56.     Second, as of the filing of this Motion, Debtors have not commenced monthly payments to Lender.  The nondefault contract rate of interest under the Loan Documents is 5.60%.  See Nodarse Decl., Ex. B (Loan Agreement), §2.6.  With respect to the valuation of the Mortgaged Property for purposes of Section 362(d)(3)(B), Debtors face a Hobson's choice:

a)     if the lower values alleged by Debtors are used, Debtors would only have to pay Lender $63,298.31 per month to satisfy Section 362(d)(3)(B), but this valuation will also give rise to a larger deficiency claim for Lender, impacting Debtors' ability to secure the approval of an impaired creditor class, as discussed in greater detail below in subsection I(d); or

b)     conversely, if the higher projected values upon stabilization are used, Lender's deficiency claim will be smaller (although still capable of controlling the unsecured creditor class), but Debtors must make higher monthly payments to Lender ($76,066.67) and, to the extent Debtors intend to propose a plan that will pay Lender's secured claim over time, the amount to be so paid will be significantly greater.

57.    Unless Debtors can establish, in opposition to this Motion, the existence of sufficient monthly revenues to make the required payments to Lender, the Court should grant Lender relief from the automatic stay pursuant to 11 U.S.C. 362(d)(3).

### d.   Debtors Cannot Confirm a Plan of Reorganization

58.    By this Motion, Lender seeks relief from the automatic stay pursuant to Section 362(d)(1), (2) and (3) of the Bankruptcy Code.  Relevant to the Court's consideration of each of these provisions is the fact that Debtors cannot file a plan of reorganization that has a reasonable probability of being confirmed.  Because Debtors must obtain the favorable vote of at least one impaired creditor class in order to confirm any plan, and because Lender's deficiency claim is such that it will control the vote of the unsecured creditor class, any effort by Debtors to propose a plan of reorganization in these cases would be futile.

59.    Nearly identical facts were considered by this Court in In re 266 Washington Assocs., 141 B.R. 275 (Bankr. E.D.N.Y. 1992).  In granting stay relief to an undersecured mortgage lender, the 266 Washington Assocs. Court issued a well-reasoned opinion that is equally applicable to this Motion:

> Section 1129 provides two distinct avenues for confirmation of a reorganization plan, one grounded on the consent of impaired classes of claims and the other hinged on a judicial cram down over the objections of impaired classes.  A bankruptcy court can confirm consensually under 11 U.S.C. § 1129(a) if all the requirements of subsection (a) are satisfied, including (a)(8), which necessitates acceptance of the plan by all impaired classes of claims.  Alternatively, a plan can be confirmed over dissenting classes of claims under 11 U.S.C. § 1129(b) if all the requirements of subsection (a) of Section 1129 are satisfied, excluding (a)(8), and the bankruptcy court is satisfied that the plan does not discriminate unfairly and is fair and equitable with respect to each class of impaired claims that has not accepted the plan.
>
> Access by a plan proponent to the alternative cram down mechanism is not always assured.  An essential statutory condition precedent to utilization of 11 U.S.C. § 1129(b) is fulfillment of the 11 U.S.C. §

ME1 39867231v.1

> 1129(a)(10) requirement that at least one impaired class (not counting the votes of insiders) must have accepted the plan. Under 11 U.S.C. § 1126(c), a class of claims accepts a plan if more than one-half in number and at least two-thirds in amount of claims voting in a class favor the plan. Thus, one creditor whose claim totals more than one-third of all claims in the class will be able to prevent the class from accepting the plan by voting against the plan.

141 B.R. 275, at 282.

60.     Given the size of Lender's unsecured deficiency claim (between $332,730.20 and $3,068,827.20 depending on the value of the Mortgaged Property) and the aggregate total of all other claims reflected on the Debtors' Schedules ($677,266.50), there is no creditor class that could be legally fashioned by Debtors in which Lender's deficiency claim would not exceed one-third in amount of the claims in the class. Accordingly, there are no circumstances under which Debtors can propose a plan of reorganization with any possibility of being confirmed. In the event Debtors do submit a proposed plan of reorganization, Lender expressly reserves all objections to confirmation thereof, including those raised hererin.

61.     For the foregoing reasons, the Court should grant stay relief in favor of Lender pursuant to Section 362(d)(1), (d)(2) and/or (d)(3).

## II.     ALTERNATIVELY, DEBTORS' BANKRUPTCY CASES SHOULD BE DISMISSED PURSUANT TO 11 U.S.C. § 1112(b)

62.     It is said repeatedly that an "honest" debtor is entitled to the benefits of the bankruptcy process. The undisputed actions of these Debtors should be analyzed to determine if they are entitled to the benefits of the bankruptcy process. Refusal to permit property inspections. Refusal to provide financial information. Refusal to turnover excess rental revenue. Refusal to comply with an injunction in a state court receivership order. This Court should send a signal that it is not a safe refuge for entities that act improperly, especially where other creditors are small in amount and have no realistic chance of receiving any meaningful distribution.

63.     Section 1112(b) of the Bankruptcy Code requires that the Court dismiss a chapter

11 case if "cause" for dismissal exists.  Section 1112(b)(1) states in relevant part:

> Except as provided in paragraph (2) and subsection (c), on request
> of a party in interest, and after notice and a hearing, the court shall .
> . . dismiss a case under this chapter, whichever is in the best interest
> of creditors and the estate, for cause . . . .

11 U.S.C. §1112(b)(1).

64.     Although "cause" is not defined in the Bankruptcy Code, the Second Circuit has

expressly held that a chapter 11 case may be dismissed for cause if the petition was not filed in

"good faith."  In re C-TC 9th Ave.  Partnership, 113 F.3d 1304, 1310 (2d Cir. 1997); In re Cohoes

Indus. Terminal, Inc., 931 F.2d, 222, 227 (2d Cir. 1991); see also In re First Conn. Consulting

Group, Inc., 254 Fed. Appx. 64, 68 (2d Cir. 2007).  In general, where, as here, "the timing of the

filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole,

purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good

faith."  In re Encore Prop. Mgt. of W. New York, LLC, 585 B.R. 22, 30–31 (Bankr. W.D.N.Y.

2018).

65.     To determine whether a case was filed in bad faith, courts consider the following

eight factors: (1) the debtor only has one asset; (2) the debtor has few unsecured creditors which

claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject

of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial

condition is, in essence, a two party dispute between the debtor and secured creditors which can

be resolved in a pending state court action; (5) the timing of the debtor's filing evidences an intent

to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6) the debtor has no cash flow; (7) the debtor cannot meet current expenses including payment of

personal and real property taxes; and (8) the debtor has no employees.  In re C-TC 9th Ave.

<u>Partnership</u>, 113 F.3d at 1311.  The court should not apply these "factors mechanically or in isolation, and may choose to consider one or all in its effort of analyzing the totality of the circumstances."  <u>In re Neilson</u>, 2018 WL 6982228, at *3 (Bankr. N.D.N.Y. Aug. 31, 2018); <u>see also</u> <u>In re C-TC 9th Ave. Partnership</u>, 113 F.3d at 1312 (determination of bad faith is a "highly factual determination but also one that may sweep broadly.").

66.     In the instant case, consideration of the above factors weighs heavily in favor of dismissal.  First, as single asset real estate entities, Debtors have only one material asset, the Mortgaged Property.

67.     Second, Debtors have few unsecured creditors whose claims are small in comparison to Lender's secured claim.  Per Debtors' Schedules, alleged unsecured claims as of the Petition Date totaled $677,266.50.  By comparison, Lender is owed in excess of $16,630,000.

68.     Third, Debtors' only material asset, the Mortgaged Property, is the subject of the State Court Action (a mortgage foreclosure action), which was commenced as a result of, *inter alia*, Debtors' failure to make Debt Service Payments in accordance with the Loan Documents.

69.     Fourth, Debtors' financial condition is, in essence, a two-party dispute between Debtors and Lender, which can more appropriately be resolved in state court via the State Court Action.

70.     Fifth, the timing and circumstances of the bankruptcy filings evidence bad faith, as the Debtors spent three months willfully violating the State Court's Receivership Order and refusing to cooperate with the Receiver, only to immediately file bankruptcy proceedings when all remaining efforts to delay enforcement of the Receivership Order had failed and the Receiver was prepared to begin collecting rents.

ME1 39867231v.1

71.    Sixth, Debtors have no cash flow other than the rents of the Mortgaged Property, which are Lender's property and which Debtors have no right to collect or use under applicable state law.  Indeed, even with the benefit of such rents, Debtors have insufficient cash flow to make required payments to Lender under Section 362(d)(3), as established above.

72.    Finally, on information and belief, Debtors have no employees and are managed by insiders of the Debtors.

73.    All factors weigh in favor of a finding that Debtors' bankruptcy cases were filed in bad faith.  Accordingly, this Court should dismiss the bankruptcy cases pursuant to 11 U.S.C. §1112(b).

## III.    ALTERNATIVELY, THE RECEIVER SHOULD BE EXCUSED FROM COMPLYING WITH 11 U.S.C. § 543 AND SHOULD REMAIN IN PLACE

74.    Should the Court decline to issue a decision at this time on Lender's request for stay relief and dismissal, Lender respectfully requests that the Receiver remain in place to manage and collect the Rents from the Mortgaged Property.  Pursuant to Section 543 of the Bankruptcy Code, a "custodian" is to turn over to the debtor-in-possession any property of the debtor that is in the possession, custody or control of the custodian, unless the court determines that the interests of creditors would be better served by permitting the custodian to continue in possession, custody or control of such property.  See 11 U.S.C. § 543(d)(1); In re Lizeric Realty Corp., 188 B.R. 499, 506 (Bankr. S.D.N.Y. 1995), citing Dill v. Dime Savings Bank, FSB (In re Dill), 163 B.R. 221, 225 (E.D.N.Y. 1994) (explaining Section 543(d)(1) is a modified abstention provision that reinforces the policies underlying Section 305 of the Bankruptcy Code).  The Bankruptcy Code defines "custodian" to include a state court-appointed receiver.  In re Dill, 163 B.R. at 225; In re 245 Associates, L.L.C., 188 B.R. 743, 747–48 (Bankr. S.D.N.Y. 1995); In re Snergy Properties, Inc., 130 B.R. 700, 703 (Bankr. S.D.N.Y. 1991).

75.     In considering whether to exercise its discretion under Section 543(d)(1), a court should consider: (1) whether there will be sufficient income to fund a successful reorganization; (2) whether the debtor will use the turnover property for the benefit of the creditors; (3) whether there has been mismanagement by the debtor; and (4) whether there are preferences which a receiver is not empowered to avoid. In re Dill, 163 B.R. at 225.

76.     Furthermore, when deciding whether to preserve the status quo and leave a receiver in place, the Court must examine the interests of all secured and unsecured creditors. Id., 163 B.R. at 225; In re Si Yeon Park. Ltd., 198 B.R. 956, 964 (Bankr. C.D. Cal. 1996).   The interests of the debtor, however, are not part of the criteria considered when applying Section 543(d)(1).   Id. (citing 4 Collier on Bankruptcy, ¶ 543.05 ("Section 543(d)(1) does not require an analysis of the interests of the debtor")).   When the vast majority of a debtor's debts are owed to one party, that party's interests are given great weight.   See In re Poplar Springs Apartments of Atlanta Ltd., 103 B.R. 146, 150 (Bankr. S.D. Ohio 1989) ("Although the interest of unsecured creditors must be protected, the overwhelming amount of these debtors' obligations are to [secured lender]. Therefore, it is primarily [secured lender's] interests which must be balanced against the debtors' rights").

77.     The facts of In re Lizeric are instructive.   In that case, the bankruptcy court determined that the above-listed factors weighed in favor of excusing the receiver from turning over management of the property, even though debtor's ability to fund a successful reorganization was still an open issue.   188 B.R. at 507.   The debtor's default under the relevant loan documents was the cause of the rent receiver's appointment.   Id.   There was no evidence that there were preferences that the receiver was powerless to avoid, and given that the debtor had previously mismanaged the property, it was apparent that the debtor would not operate the property for the

benefit of creditors.  Id.  Therefore, the receiver was permitted to remain in place and continue to manage the property.  Id.

78.     The same is true of the instant bankruptcy proceedings.  Notwithstanding Lender's position, established herein, that Debtors cannot possibly confirm a plan of reorganization, Debtors' ability to *fund* a successful reorganization is still at issue.  Debtors' various defaults under the Loan Documents were the cause of the Receiver's appointment.  Debtors themselves can still pursue preference actions under Section 547 of the Bankruptcy Code in the context of these bankruptcy cases.  Finally, and most importantly, Debtors' conduct in the months leading up to the Petition Date, which included the concealment of financial information from Lender, refusal to grant Lender access to the Mortgaged Property in violation of the Loan Documents, and willful violation of the State Court's Receivership Order, demonstrate that Debtors cannot be trusted to operate the Mortgaged Property for the benefit of creditors.  Accordingly, the Receiver should be permitted to remain in place and manage the Mortgaged Property.

## CONCLUSION

For the reasons set forth herein, Lender respectfully requests that the Court enter an Order granting Lender relief from the automatic stay to continue prosecution of the State Court Action pursuant to Section 362(d)(1) of the Bankruptcy Code, dismissing Debtors' bankruptcy cases pursuant to Section 1112(b) of the Bankruptcy Code, and/or excusing the Receiver from complying with Section 543(a) and (b) of the Bankruptcy Code and allowing the Receiver to continue to manage the Mortgaged Property pursuant to Section 543(d) of the Bankruptcy Code.

Date: April 6, 2022

**McCARTER & ENGLISH, LLP**
*Counsel to Lender*

By: *s/ Joseph Lubertazzi, Jr.*
        Joseph Lubertazzi, Jr.
        John R. Stoelker

Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Tel.:  (973) 639-2082
Fax:  (973) 624-7070

-AND-

Worldwide Plaza
825 Eighth Avenue, 31st Floor
New York, NY 10019
Tel.:  (212) 609-6800
Fax:  (212) 609-6921

27